## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

DAVID PENA, JR.,

      Plaintiff,

v.                                Case No.  6:19-cv-1804-Orl-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

      Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying his application for supplemental security income ("SSI").  Plaintiff filed his application for SSI on December 19, 2014, alleging a disability onset date of February 1, 2012, which was denied initially and on reconsideration.  (Tr. 71, 94-104, 143-48.)  The assigned Administrative Law Judge ("ALJ") held a hearing on December 12, 2018, at which Plaintiff was not represented by counsel.  (Tr. 38-70.)  The ALJ found Plaintiff not disabled from December 19, 2014, the date the application was filed, through March 4, 2019, the date of the decision.[2]  (Tr. 22-33.)  Plaintiff

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Docs. 28 & 29.)

[2] The relevant period for his SSI application is the month in which the application was filed through the date of the ALJ's decision.  (Tr. 23.)

is appealing the Commissioner's final decision that he was not disabled during the relevant time period.  Plaintiff has exhausted his available administrative remedies and the case is properly before the Court.  (Tr. 1-5.) The Court has reviewed the record, the briefs, and the applicable law.  For the reasons stated herein, the Commissioner's decision is **REVERSED and REMANDED**.

## I.    Standard

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the

decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.   Discussion

### A.   Issues on Appeal

Plaintiff raises two issues on appeal.  (Doc. 27.)  First, Plaintiff argues that the ALJ erred in determining he had the residual functional capacity ("RFC") "to perform medium work with some additional limitations after failing to adequately consider and weigh all of the limitations and opinions outlined by [his] treating physician and failing to adequately consider the opinion of the examining, consultative physician."[3]  (*Id.* at 7.)  Second, Plaintiff argues that the ALJ erred in relying on testimony of the vocational expert ("VE") "after posing and relying on a hypothetical question that did not adequately reflect" Plaintiff's limitations.  (*Id.* at 13-17.)

In response, Defendant counters that the ALJ's RFC determination is supported by substantial evidence and "the ALJ did not err in his

---

[3] Specifically, Plaintiff argues that the ALJ failed "to indicate the weight assigned to Coastal Mental Health [Centers] ["CMH"] and the treating psychiatrist," Christine Grissom, M.D. (Doc. 27 at 12.)  Plaintiff also argues that the ALJ failed to properly consider the opinion of Valerie M. Acosta Alicea, Psy.D., a State Agency psychological consultative examiner.  (*Id.* at 12-13.)

consideration of the evidence from CMH, Dr. Grissom, or Dr. Acosta Alicea."
(Doc. 31 at 4-9.)  Defendant also counters that the ALJ did not err in posing
the hypothetical to the VE and that the ALJ adequately accounted for
"Plaintiff's moderate limitations in concentrating, persisting, or maintaining
pace by limiting him to simple and routine tasks with additional mental
limitations."  (*Id.* at 9-11.)   The Court agrees with Plaintiff on the first issue,
in part, and, therefore, does not address the remaining issues in detail.

### B.    Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when
making a disability determination.  *See* 20 C.F.R. § 416.920(a)(3).  With
regard to medical opinion evidence, "the ALJ must state with particularity
the weight given to different medical opinions and the reasons therefor."
*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).
Substantial weight must be given to a treating physician's opinion unless
there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436,
1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not
bolstered by the evidence; (2) evidence supported a contrary finding; or (3)
treating physician's opinion was conclusory or inconsistent with the doctor's
own medical records."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th
Cir. 2004).  When a treating physician's opinion does not warrant controlling

weight, the ALJ must nevertheless weigh the medical opinion based on: (1)
the length of the treatment relationship and the frequency of examination,
(2) the nature and extent of the treatment relationship, (3) the medical
evidence supporting the opinion, (4) consistency of the medical opinion with
the record as a whole, (5) specialization in the medical issues at issue, and (6)
any other factors that tend to support or contradict the opinion.  20 C.F.R. §
416.927(c)(2)-(6).  "However, the ALJ is not required to explicitly address
each of those factors.  Rather, the ALJ must provide 'good cause' for rejecting
a treating physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431
F. App'x 830, 833 (11th Cir. 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more
weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d
513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. § 416.927(c)(2), "[t]he
opinions of state agency physicians" can outweigh the contrary opinion of a
treating physician if "that opinion has been properly discounted," *Cooper v.
Astrue*, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008).  Further, "the ALJ
may reject any medical opinion if the evidence supports a contrary finding."
*Wainwright v. Comm'r of Soc. Sec. Admin.*, 2007 WL 708971, at *2 (11th Cir.
Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th
Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining [S]tate

agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p[4] (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

## C.   Relevant Evidence of Record

### 1. Treatment Records from CMH and Dr. Grissom

Plaintiff began mental health treatment at CMH on December 15, 2017. (Tr. 430-32.) His initial assessment was conducted by Alexander Mescavage, LMHC, who indicated that Plaintiff's chief complaint was that he had lost his job, was about to lose his house, was depressed [when] off [of] his medication, and "ended up with suicidal ideation [and] depression." (Tr. 430.) Plaintiff also reported depressive, psychotic, and elevated mood/mania symptoms. (*Id.*) As to his past psychiatric history, it was noted that Plaintiff was "seeing Allen (outpatient)" who was treating him for depression and

---

[4] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017. However, because Plaintiff's application predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

schizophrenia.  (*Id.*)  It was also noted that Plaintiff was "psychiatrically hospitalized at least once," and "Baker Acted 12/4 until 12/9/2017" due to suicidal ideations with intent and inability to eat or sleep.  (Tr. 430-31.) Plaintiff also had a history of opioid abuse.  (Tr. 431.)

A mental status exam revealed Plaintiff presented with the following: a flat mood; clean appearance; inadequate attention; withdrawn behavior during interview; low self-awareness in terms of cognitive performance; did not appear dangerous to others; appeared to be a danger to himself due to "recent attempts"; inappropriate eye contact; demonstrated intellectual insight into problem; poor judgment; looked his stated age; remote memory; labile affect; agitated motor activity; oriented to place, person, situation and time; inadequate perception; no sensory deficits; excessive speech; and a paranoid thought process.  (Tr. 431-32.)

The following was noted with respect to Plaintiff's level of care:

The patient has or is being evaluated for a DSM-5 diagnosis. The presenting behavioral, psychological, and/or biological dysfunctional and functional impairment[s] (occupational, academic, social) are consistent and associated with DSM-5 psychiatric disorder[s].
The patient has persistent DSM-5 illness with a repeated history of admissions to 24 hour treatment for which maintenance treatment is required to maintain functioning.
The patient does not require a higher level of care.
The patient demonstrates a desire and is motivated to manage symptoms and make behavioral change.  This is evidenced by attending therapy, taking medications as prescribed, and following established treatment plan goals.  The patient is

capable of developing skills to manage symptoms to make
behavioral change.
Prognosis is poor.  Based on the foregoing [l]evel of [c]are
observations we recommend the following services: [m]edication
[m]anagement [once] per month . . . [and] [i]ndividual therapy
weekly.

(Tr. 432.)  Plaintiff was diagnosed with schizoaffective disorder, bipolar type,

and assigned a Global Assessment of Functioning ("GAF") score of 45 based

on serious symptoms or serious impairment in social, occupational, or school

functioning.[5]  (*Id.*)  Mr. Mescavage signed this treatment note as the

"Rendering Clinician" and as the "Supervising Clinician."  (*Id.*)

Plaintiff returned to CMH on December 28, 2017, accompanied by his

wife, to establish psychiatric care and for a psychiatric evaluation.  (Tr. 433.)

Plaintiff's chief complaint was anxiety.  (*Id.*)  It was noted that he was taking

Seroquel, Lorazepam, Clonazepam, and Celexa, "most recently prescribed by

Florida Hospital[,] Deland."  (*Id.*)  Plaintiff's wife reported that he had a

history of severe anxiety, bipolar disorder, and schizophrenia.  Plaintiff's wife

also reported taking him to Florida Hospital in Deland "due to increased

command hallucinations."  (*Id.*)  Plaintiff reported frequent audio-visual

hallucinations, but his wife reported distracting him with outings, which

helped alleviate his symptoms.  (*Id.*)  Plaintiff's wife also stated that he had a

---

[5] A GAF score of 41-50 is indicative of serious symptoms or any serious
impairment in social, occupational, or school functioning.

history of nightmares and struggled with severe anxiety with symptoms consisting of excessive worry, panic attacks, and restlessness.  (*Id.*)  Plaintiff's wife also reported Plaintiff had agoraphobia and paranoid feelings, he had been incarcerated for 11 years, and that "his anxiety and nightmares may be worse due to this."  (*Id.*)  Plaintiff's wife also admitted that Plaintiff had "been involved in gang activity in the past."  (*Id.*)  The treatment note indicates that Plaintiff did not want the door closed during the visit.  (*Id.*)

It was again noted that Plaintiff exhibited depressive, psychotic, and elevated mood/manic symptoms.  (*Id.*)  A mental status exam revealed Plaintiff exhibited the following: a clean appearance; looked his stated age; inappropriate eye contact; memory within normal limits; adequate attention and perception; restless motor activity; oriented to person, place and situation; low self-awareness; paranoid thought process; did not appear dangerous to self or others; minimal speech; anxious affect; full range mood; slight awareness in terms of insight into problem; guarded behavior during interview; and fair judgment.  (Tr. 435.)  Plaintiff's "Level of Care" notes were similar to his previous visit, but it was also noted that he had "symptomatic distress and demonstrate[d] impaired functioning due to psychiatric symptoms and/or behavioral [symptoms] in at least one area: occupational, academic, or social, which are a direct result of DSM-5 diagnosis," as "[e]videnced by clinical description of symptoms and measurable behavioral

impairments." (*Id.*)  His prognosis was again listed as "poor."  (*Id.*)  Plaintiff's Seroquel prescription was increased for mood stabilization and psychotic symptoms, he was started on Trazadone for insomnia, and was to begin cognitive behavioral therapy.  (*Id.*)

Plaintiff's diagnoses were listed as schizoaffective disorder, bipolar type, and he was again given a GAF score of 45 due to serious symptoms or serious impairment in social, occupational, or school functioning.  (Tr. 436.) It was noted that Plaintiff's PFSH ("Past Family and Social History") was "[r]eviewed [b]y [d]octor" on December 28, 2017.  (*Id.*)  The Psychiatric Evaluation was signed by Teresa Rogers, PA-C, as the rendering clinician, on December 28, 2017, and by Dr. Grissom, as the supervising clinician, on January 8, 2018.  (*Id.*)

Plaintiff was also seen at CMH on August 13, 2018.  (Tr. 439-42 ("Re-Assessment" Report); Tr. 443-47 ("Psychiatric Re-Evaluation").)  In the Re-Assessment Report, it was noted that Plaintiff complained that he was doing worse, was shaking and locking his jaw, was still waking up, was still hearing voices and seeing things, and had a lot of paranoia.  (Tr. 439.)  He again presented with depressive and psychotic symptoms.  (*Id.*)  In terms of his past psychiatric history, it was noted that Plaintiff was previously diagnosed with bipolar disorder, type 1 and that he "was 20 years old when diagnosed with psychosis."  (Tr. 440.)  Plaintiff's mental status exam

revealed: full-range mood; clean appearance; adequate attention; cooperative behavior during interview; cognitive performance within normal limits; did not appear to be dangerous to others or self, but past attempts were noted; appropriate eye contact; emotional insight into problem; fair judgment; looked stated age; memory within normal limits; anxious affect; restless, agitated motor activity; oriented to person, place, situation and time; inadequate perception; minimal speech; intact thought process; and average estimated intelligence.  (Tr. 441-42.)

The "Level of Care" notes were similar to the December 28, 2017 notes, and it was again noted that Plaintiff had "symptomatic distress and demonstrate[d] impaired functioning due to psychiatric symptoms and/or behavioral [symptoms] in at least one area: occupational, academic, or social, which are a direct result of DSM-5 diagnosis." (Tr. 442.)  However, Plaintiff's prognosis was noted as "fair." (*Id.*)  He was again diagnosed with schizoaffective disorder, bipolar type, a tic disorder, and a GAF score of 45. (*Id.*)  William Riley, LMHC, signed the "Re-Assessment" on August 13, 2018 as the rendering and supervising clinician.  (*Id.*)

Plaintiff was also seen for a "Psychiatric Re-Evaluation" [6] at CMH on

---

[6] The Psychiatric Re-Evaluation was signed by Gravil Joseph, ARNP/BC-PMHNP, as the rendering clinician on August 13, 2018, and by Dr. Grissom as the supervising clinician on August 14, 2018.  (Tr. 446-47.)

August 13, 2018. (Tr. 443-47.)  Based on Plaintiff's wife's statements

regarding his symptoms, the provider prescribed Klonopin for panic attacks

associated with his paranoia and Trileptal.  (Tr. 443.)  A mental status

examination revealed Plaintiff exhibited the following: a clean, neat

appearance; looked his stated age; inappropriate eye contact; deficient

memory; inadequate attention and perception; agitated motor activity;

oriented to place, time, and person; in terms of cognitive performance, had

poor concentration, poor memory, slow processing, and low self-awareness; he

was experiencing hallucinations; did not appear dangerous to self or others;

slurred speech; manic affect; constricted range of mood; emotional insight

into problem; hostile behavior during interview; poor judgment; and below

average intelligence.  (Tr. 445-46.)  The "Level of Care" assessment was

similar to previous assessments; however, Plaintiff's prognosis was listed as

"good."  (Tr. 446.)  Plaintiff's diagnoses were schizoaffective disorder, bipolar

type, tic disorder, and he was again given a GAF score of 45.  (*Id.*)  It was

noted that the "PFSH" was reviewed by a doctor on August 13, 2018.  (*Id.*)

Plaintiff was instructed to follow-up within two weeks.  (*Id.*)

In a letter dated January 14, 2019, Dr. Grissom stated Plaintiff had

been receiving treatment at CMH since December 15, 2017 and had been

"[d]iagnosed with the following: F25.0 Schizoaffective Disorder: Bipolar

Type[;] F43.12 Post-Traumatic Stress Disorder: Chronic[;] [and] F41.0 Panic

12

Disorder."[7]  (Tr. 455.)

A partial "Clinic Visit Note"[8] from CMH dated January 14, 2019 appears to show a portion of a mental status examination, noting that Plaintiff exhibited the following: looks stated age; memory within normal limits; unremarkable affect; normal motor activity; oriented to place, situation, time, and person; adequate perception; no sensory deficits; clear speech; thought process within normal limits; and average estimated intelligence.  (Tr. 456.)  The CMH provider noted that Plaintiff presented to the office with his wife for medication management and that:

> Patient is currently taking Clonazepam 0.5 mg [three times a day], [G]eodon 20 mg [orally every morning] and [G]eodon 40 mg [orally] [at] dinner time with food, [D]oxepin 50 mg [orally] and [T]rileptal 300 mg [orally twice daily].  Wife states that [patient's] medications are significantly subsiding his excessive worry, panic attacks, paranoia, mood swings, anger outburst[s] and restlessness.  Patient is compliant with E FORCE.  Medications effective, [sic] and continue the same med[ication] as prescribed last visit and [follow-up] in 4 weeks.

(*Id.*)  Plaintiff's diagnoses remained the same and the "Level of Care" note

---

[7] An undated letter from Gravil Joseph, ARNP, "a Registered Nurse Practitioner" with CMH echoed Dr. Grissom's letter.  (Tr. 454.)

[8] The "Clinic Visit Note" clearly indicates that it is page "2 of 3," but pages one and three are not in the record.  (Tr. 456.)  It is unclear which CMH provider prepared this note as the signature page is missing.  Also, a "Medication Flowsheet" for Plaintiff, generated by CMH on November 5, 2018, lists, *inter alia*, "Clinic Visit Note[s]" on October 29, 2018, September 27, 2018, August 30, 2018, May 14, 2018, April 12, 2018, and March 1, 2018.  (Tr. 448-51.)  The corresponding notes from the listed "Clinic Visits" are not in the record.

was similar to previous notes but listed Plaintiff's prognosis as "good." (*Id.*)

## 2.    Psychiatric Evaluation by Dr. Acosta Alicea

On January 15, 2019, at the request of the ALJ,[9] Dr. Acosta Alicea examined Plaintiff and prepared a Medical Source Statement ("MSS") of Ability to Do Work-Related Activities (Mental) (Tr. 458-60) and a Disability Evaluation (Tr. 462-64). In the MSS, Dr. Acosta Alicea opined that Plaintiff's ability to understand, remember, and carry out instructions would be affected by his impairment(s), which would also cause extreme "restrictions [in] the following work-related mental activities": understanding, remembering, and carrying out simple instructions; making judgments on simple work-related decisions; carrying out complex instructions; and making judgments on complex work-related decisions. (Tr. 458.) Dr. Acosta Alicea pointed to the severity and presentation of Plaintiff's symptoms in support of her assessment, noting that: "David requires constant supervision, guidance, and reinforcement. The wife is his caretaker and make[s] decisions for him. He struggled significantly to answer questions and follow instructions." (*Id.*) She also opined that Plaintiff's "ability to interact appropriately with

_____

[9] At the December 12, 2018 administrative hearing, the ALJ noted that due to the limited medical evidence in the record, which was attributed to Plaintiff's lack of insurance at times, he would be requesting a consultative psychological/psychiatric exam, which was rendered by Dr. Acosta Alicea. (Tr. 66-67.)

supervisors, coworkers, and the public, as well as respond to changes in a routine work setting," would be affected by his impairment(s).  (Tr. 459.)

Dr. Acosta Alicea opined that Plaintiff's restrictions would be "extreme" in the following work-related mental activities: interacting with the public; interacting appropriately with supervisors(s); interacting appropriately with co-workers; responding appropriately to usual work situations and to changes in a routine work setting.  (*Id.*)  In support of this assessment, Dr. Acosta Alicea explained that "David frequently battles with hallucinations, paranoid thoughts, and anxiety" and "denies being interested in social interactions." (*Id.*)  Dr. Acosta Alicea also opined that Plaintiff's "ability to concentrate, persist, or maintain pace and the ability to adapt or manage" himself were also affected by his impairment(s), explaining as follows: "Given the presentation of his symptoms[,] his performance and functionality is [sic] affected.  He has difficulty with concentration [and] impulse control and is unable to make decisions."  (*Id.*)  She pointed to Plaintiff's history of schizoaffective disorder, bipolar type, PTSD, and panic disorder in support of her assessment.[10]  (*Id.*)  She also opined that Plaintiff was unable to manage benefits in his best interest.  (Tr. 460.)

---

[10] Dr. Acosta Alicea responded "N/A" to the following question: "If the claimant's impairment(s) include alcohol and/or substance abuse, do these impairments contribute to any of the claimant's limitations as set forth above?" (*Id.*)

15

In her Disability Evaluation, Dr. Acosta Alicea recited Plaintiff's significant history, based largely on the information provided by Plaintiff's wife. (Tr. 462-63.)  According to Dr. Acosta Alicea:

David completed an 8th grade education level; however, he obtained his GED in 2004.  He is currently unemployed.  As indicated by his wife, his last and longest employment was at Discovery World Furniture for three months in 2015.  He was fired for "not keeping up with his tasks, not focusing or following directions."  David is not currently attempting to secure employment; the wife believes his mental state interferes with his ability to work.

. . .  In the past five years he has been in multiple car accident[s] where he has injured his back.  Between 2017 and 2018, he was hospitalized for high blood pressure "caused by anxiety", went in a coma for one week and was [on] life support.  . . .  The wife denied a history of surgeries or seizures in the last five years.  David is currently covered by United Healthcare health insurance and is under the care of Dr. Westfall.  He is prescribed Hydrocodone, Lyrica, Ibuprofen, and Clonidine.

As indicated by the wife, David was diagnosed with "Posttraumatic Stress Disorder (PTSD); Schizoaffective Disorder, Bipolar Type; and Panic Disorder" in 2015 and 2016.  He received psychological treatment in 2010 and 2016 for one year.  He has been receiving psychiatric treatment since 2009.  He is prescribed Geodon, Trileptal, Clonazepam and Doxepin.  David has been Baker Act[ed] three times due to suicidal thoughts, aggressive behaviors[,] and auditory hallucinations with commands.  His last hospitalization was in 2018.  Family history of mental illness was significant for Schizophrenia and Bipolar Disorder.

David has a history of smoking marijuana and using cocaine "on and off" between his teen years and six years ago.  No further details were shared. Regarding his legal history, David has been arrested and incarcerated more than five times.  Charges include arm[ed] robbery and drug charges.  Reportedly, at some point he assisted to a substance abuse treatment program as part of his

16

probation requirements. [The] [l]ongest time [he spent] in jail was [] four years. He has been out of jail since 2006. Presently, he is not [on] probation and has no legal cases pending.

David experiences auditory and visual hallucinations. As indicated by the wife, he sees a person in black who laughs at him. He also hears several voices who many times give him commands such as to throw things and to harm himself. Reportedly, he hallucinates daily and has difficulty sleeping. David constantly paces around, especially if he is anxious. He gets startled very easily and has panic attacks. Symptoms include racing [heartbeat], sweating, hyperventilating, and crying. He hits his head, gets aggravated and becomes fidgety. He also has episodes where he goes in a corner, withdraws[,] and cries. David has paranoid thoughts and frequently reports seeing bugs that are hearing him and watching him. If he sees white jackets, like lab or medical coats, he gets very anxious and has a panic attack. He is constantly afraid of getting hospitalized and cannot be in a place with closed doors. As indicated by the wife, he has more than one panic attack per week. Furthermore, David is not interest[ed] in social interactions and has no friends. The wife believes that he frequently relives traumatic events in his life such as "being stabbed, shot at and beaten."

(Tr. 462-63.)

Dr. Acosta Alicea referenced supporting documents from CMH, including Dr. Grissom's January 14, 2019 letter, documenting Plaintiff's diagnoses, treatment history, and medications. (Tr. 463.) She also referred to supporting documents from "Florida Hospital [], from a hospitalization between 11/30/2017 and 12/07/2017" which were provided in his file. (*Id.*) She noted that his "[d]ischarge diagnosis documented [a]cute hypoxic respiratory failure due to illicit drug overdose, left lobe [p]neumonia, IV heroin abuser, polysubstance abuse, [b]ipolar, history of [p]olycystic [k]idney

17

[d]isease, [h]ypertension and [h]ypomagnesemia." (*Id.*)  In terms of activities

of daily living, Plaintiff reported waking up at 4:30 a.m. and going to bed at

1:30 a.m., his wife bathed and dressed him and prepared his meals, and

during an average day, he watched TV, would draw and color, and played

games on a tablet.  (Tr. 464.)  He reported having a drivers' license but did

not drive.  (*Id.*)

Dr. Acosta Alicea made the following observations regarding Plaintiff's

"[c]urrent mental status":

> [Plaintiff] was casually dressed with adequate grooming.  He was
> alert, and oriented to person.  He did not know [the] current date,
> his age, place and seemed unaware of the purpose of the
> evaluation.  His mood was anxious and paranoid with congruent
> affect.  His attitude was somewhat cooperative and compliant.
> David constantly paced around the room and repeatedly
> indicated that he wanted to leave.  He presented hesitant eye
> contact.  No gait difficulties were noted.  His cognitive processing
> was very slow but goal oriented.  He denied current suicidal and
> homicidal ideations.  He presented auditory and visual
> hallucinations.  David frequently cover[ed] his ears and
> verbalized, "No, I'm not hearing anything."  Attention,
> concentration and impulse control were poor.  He was unable to
> spell the word "world" or his name correctly or [to name] former
> Presidents.  He was unable to count to 40 by serial 3's or 2's.  He
> recalled one of three words after a two-minute interval.  The wife
> provided his background information.  His insight and judgment
> were poor during the evaluation.

(*Id.*)  As to Plaintiff's "functional ability," Dr. Acosta Alicea opined that

should he be entitled to benefits, he would be incapable of managing his own

funds; his social functioning was impaired based on his reported lack of

interest in social interactions; and his "[f]unctional ability [was] impaired based on reported hallucinations, paranoid thoughts, anxiety and panic attacks." (*Id.*) Dr. Acosta Alicea diagnosed Plaintiff with schizoaffective disorder, bipolar type (per history), PTSD (per history), panic disorder (per history), and unspecified substance-related disorder. (*Id.*)

### 3. The ALJ's Decision

At step two of the sequential evaluation process,[11] the ALJ found that Plaintiff had the following severe impairments: polycystic kidney disease; depressive disorder; PTSD; schizoaffective disorder, bipolar disorder type; panic disorder; and substance addiction disorder. (Tr. 24.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 25-26.)

Then, before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform medium work, but with the following limitations:

> [H]e can lift and/or carry 50 pounds occasionally, 25 pounds frequently. He can stand and/or walk, with normal break[s], for a total of six hours per eight-hour workday, and can sit, with normal breaks, for a total of six hours per eight-hour workday. In terms of postural limitations, he can occasionally climb ladders, ropes, or scaffolds. He can frequently climb ramps and stairs, balance, kneel, stoop, crouch[,] and crawl. In terms of environmental limitations, he must avoid all hazards. In

---

[11] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 416.920(a)(4).

> addition, he is limited to the performance of simple and routine
> tasks, can only occasionally interact with the general public, can
> only occasionally interact with coworkers, but with no tandem or
> group tasks required, can tolerate only occasional over[-]the[-
> ]shoulder supervision, and is limited to low-stress work, which I
> define as requir[ing] few judgments or decisions to be made on
> managerial, executive, fiscal or personal matters, and few
> changes in a routine work setting.

(Tr. 27.)  In making these findings, the ALJ discussed Plaintiff's complaints,

the medical evidence, and the opinions of record.  (Tr. 27-31.)  The ALJ

summarized Plaintiff's symptoms, in part, as follows:  "The claimant alleged

he was unable to perform work activity because of his inability to tolerate

people, due to his increased anxiety level.  He reported auditory and visual

hallucinations that subsided when he took his psychotropic medications and

ceased his illicit drug abuse."  (Tr. 27.)  The ALJ found that while Plaintiff's

medically determinable impairments could reasonably be expected to cause

the alleged symptoms, Plaintiff's statements concerning the intensity,

persistence, and limiting effects of these symptoms were not "entirely

consistent with the medical evidence and other evidence in the record."  (*Id.*)

Specifically, the ALJ found that Plaintiff's statements were

"inconsistent because the record show[ed] that [his] symptoms were

controlled with treatment when he was compliant."  (Tr. 28.)  The ALJ also

reasoned as follows:

> The claimant also reported that he was unable to find work once
> he moved to Florida from Chicago because of his legal

background, and not because of his mental disorder (Exhibit 1F). The claimant had an extensive history of substance addiction disorders and numerous incarcerations totaling 11 years for firearms and drug possession. The record contained little evidence of the claimant's numerous motor vehicle accidents that caused ongoing physical symptoms as alleged by his wife. In addition, in his 2014 application for [SSI], the claimant wrote that his wife did not receive any income, which is inconsistent with his wife's testimony that she left her career to care for the claimant (Exhibit 1D). It is also inconsistent with his report to Ms. Funes in November 2014 that his wife worked full-time (Exhibit 1F).

(*Id.*)  The ALJ also found that Plaintiff's alleged onset date of February 1, 2012 was inconsistent with the medical record, which showed no treatment until 2014. (*Id.*)

The ALJ noted that in October 2014, Plaintiff sought treatment from Robert Kent, D.O. for drug addiction to heroin and marijuana. (*Id.*) Dr. Kent diagnosed Plaintiff with opioid dependence, anxiety, and bipolar disorder, but Plaintiff stopped treatment after four months. (*Id.*) Dr. Kent noted that Plaintiff started Methadone therapy, but preferred Suboxone and was also taking Klonopin for anxiety. (*Id.*) The ALJ noted that Plaintiff's urine screenings "were positive for illicit substances at every office visit" and, in December 2014, Plaintiff was still smoking marijuana for his anxiety and taking hydrocodone. (*Id.*) Plaintiff also reported to Dr. Kent that his relationship with his family had improved since he stopped taking heroin and was doing well with improved quality of life. (*Id.*)

According to the ALJ, in November 2014, Plaintiff also sought psychotropic medication from Irma Funes, APN, for panic attacks, irritability, and insomnia. (*Id.*) Upon examination, Plaintiff was well-groomed, cooperative, and friendly and had good eye contact and hygiene. (*Id.*) It was also noted that his "mood was anxious and sad, his speech was rapid and loud, with poor insight and evidence of paranoia, delusion and obsessions." (*Id.*) Ms. Funes prescribed Lexapro, Seroquel, Xanax, and Klonopin with refills, but Plaintiff never returned for treatment. (*Id.*)

Thereafter, the ALJ noted, there was a two-year "lapse from all medical and mental health treatment," which, along with Plaintiff's work activity in 2017, "suggest[ed] that the claimant's symptoms were not limiting." (*Id.*) The ALJ then pointed to Plaintiff's hospitalization at Florida Hospital from November 19 to November 22, 2017 for chest pain and possible stroke, noting that his final diagnoses were "chest pain with negative workup, non-occlusive superficial venous thrombosis, chronic intravenous heroin abuse along with chronic cocaine, marijuana, and tobacco abuse, history of endocarditis, stroke and schizoaffective disorders/bipolar/anxiety, and polycystic kidney disease." (Tr. 29.) Plaintiff was readmitted at Florida Hospital from November 29 to December 3, 2017 for "acute hypoxic respiratory failure due to an illicit drug overdose, left lobe pneumonia, intravenous heroin use, polysubstance abuse, bipolar disorder, history of polycystic kidney disease, hypertension[,] and

hypomagnesaemia." (*Id.*)  Although Plaintiff left the hospital against medical advice on December 3, 2017, he returned to the emergency room the next day in an altered mental state and with difficulty breathing.  (*Id.*)  The ER doctor found that Plaintiff did not qualify for hospital admission and offered to transfer him to a detoxification facility, but Plaintiff and his wife declined the offer for a transfer because he was still on probation.  (*Id.*)

The ALJ also noted that, on December 20, 2017, Plaintiff sought narcotic pain medication for severe abdominal pain related to an ulcer attack from Halifax Health Hospital.  (*Id.*)  The ALJ noted that Plaintiff denied using street drugs in several months, but this was inconsistent with his previous hospitalizations at Florida Hospital.  (*Id.*)  The ALJ observed that a "urine drug screen was not performed" and, during the visit, Plaintiff "neither alleged nor exhibited symptoms of severe mental limitations" and, although Plaintiff was instructed to follow up with a gastroenterologist, he failed to do so.  (*Id.*)

The ALJ stated that Plaintiff began mental health treatment at CMH on December 15, 2017, but no urine drug screenings were performed at any of his visits.  (Tr. 30.)  He also noted that Plaintiff was diagnosed with schizoaffective disorders, bipolar disorder type, but gave little weight to these diagnoses because they were made by licensed metal health counselors.  (*Id.*)  The ALJ further noted:

When the claimant returned two weeks later, the claimant's wife said that he was taking psychotropic medications prescribed by Florida Hospital, although the record does not support that claim. His wife reported that the claimant had severe anxiety with auditory hallucinations, agoraphobia and paranoid feelings requiring her to take him to Florida Hospital. In a mental status examination, his memory was normal, his attention and perception were adequate, [sic] minimal speech and anxious effect. Teresa Rogers, [P.A.][,] as supervised by Christine Grissom, M.D.[,] confirmed the diagnosis, prescribing Seroquel and Trazadone. The claimant returned for prescription refills in March, April[,] and May 2018. An August 2018 assessment found that the claimant had symptomatic distress and demonstrated impaired functioning due to psychiatric symptoms (Exhibit 7F). The provider found that the claimant was capable of developing skills to manage his symptoms to make behavioral change. His prognosis was fair. Monthly medication management and weekly therapy was recommended, but he did not go to therapy. The claimant did not require a higher level of care.

(*Id.*)

The ALJ further observed that "[t]he complaints made to Coastal providers were made primarily by the claimant's wife[,] including a report in August 2018, that the claimant was hospitalized under the Baker Act from December 4-9, 2017 due to suicidal ideation." (*Id.*) The ALJ found this statement was inconsistent with the medical record, which "shows that he left Florida Hospital against medical advice on December 3, 2017" and that he "was denied readmission the next day because he did not meet the requirements for a medical admission, with no evidence of suicidal ideation or the inability to eat or sleep." (*Id.*)

The ALJ also summarized the treatment records from Hector Nieves, M.D., a pediatrician by specialty, who Plaintiff started seeing in February 2018 for depression.  (*Id.*)  The ALJ noted that during his visit with Dr. Nieves, Plaintiff denied illicit drug use in the previous 12 months, "which was inconsistent with his treatment at Florida Hospital three months" prior and urine drug tests were not performed.  (*Id.*)  A mental status examination by Dr. Nieves revealed "claimant was alert, oriented and cooperative with the exam[,] [h]is mood was depressed[,] and he was only oriented to name and place."  (*Id.*)  Dr. Nieves diagnosed Plaintiff, described as a 15-year-old male with a history of severe conduct disorder and aggressive behavior, with "conduct disorder, aggressive behavior, anxiety and depression."  (*Id.*)  The ALJ noted that Plaintiff was 39 years old at the time and that it was "unclear whom Dr. Nieves [was] referring to here."  (*Id.*)  Dr. Nieves referred Plaintiff to a neurologist for history of mental health disorders and suspected seizures with recurrent involuntary movement, but there was no evidence he ever followed up with the referral.  (*Id.*)  Dr. Nieves also noted that Plaintiff "had no difficulty speaking" and "complained of symptoms [of] auditory and visual hallucinations, depression and insomnia."  (*Id.*)

The ALJ also cited to CMH treatment notes dated January 14, 2019, in which Plaintiff's wife reported that his psychotropic medications were "'significantly subsiding his excessive worry, panic attacks, paranoia, mood

swings, anger outbursts and restlessness (Exhibit 8F)." (Tr. 31.)  Plaintiff

was also "oriented times four" and his "motor activity was normal, his speech

was clear[,] and his thought process was within normal limits." (*Id.*)  The

ALJ noted that "Dr. Grissom wrote that the claimant was treated for

schizoaffective disorders[,] bipolar disorder type, PTSD[,] and panic disorder

since December 15, 2017." (*Id.*)

     With respect to the opinion evidence, the ALJ gave great weight to the

State Agency medical consultant at reconsideration who opined Plaintiff

could "perform a range of medium work with postural and environmental

limitations" because the opinion was "consistent with the treatment notes

from Florida Hospital, Halifax Health Hospital[,] and Dr. Nieves." (*Id.*)

Next, the ALJ gave little weight to the opinion of the State Agency

psychological consultant at reconsideration that Plaintiff had "no more than

mild functional limitations with no severe mental impairments," reasoning

that this opinion was inconsistent with the findings of Plaintiff's mental

health providers. (*Id.*)  The ALJ also found Plaintiff "more limited mentally

at the hearing level, due to continuing, but improving symptoms from his

mental disorders." (*Id.*)

     The ALJ also gave little weight to the January 15, 2019 opinions of Dr.

Acosta Alicea that Plaintiff "was not capable of managing his own funds, was

impaired in social functioning due to lack of interest in social interaction, and

that his functional ability was impaired based on reported hallucinations, paranoid thoughts, anxiety[,] and panic attacks." (*Id.*)  The ALJ reasoned as follows:

> I give this opinion little weight because it was inconsistent with the record, including the treatment notes of the claimant's treating psychiatrist the day before and those of Dr. Nieves in 2018 (Exhibit 5F).  Dr. Acosta seemed to rely on the subjective allegations of the claimant's wife.  The claimant's wife reported that the claimant was hospitalized three times under the Baker Act, the last time in 2018, but there was no evidence in the record to support any hospitalization under the Baker Act.  She reported that the claimant had auditory and visual hallucinations accompanied by panic attacks.  In a mental status examination, the claimant's mood was anxious and paranoid.  The claimant paced around the room and indicated that he wanted to leave.  His attention, concentration and impulse control were poor.  He was unable to write his name correctly, or count to 40 by serial threes or twos.  He recalled only one word after a two-minute interval.  His insight and judgment were poor during the evaluation.  The observations by the examiner were radically different from those observed by this treating psychiatrist and Dr. Nieves.

(*Id.*)

The ALJ concluded that the RFC was supported by the medical evidence of record, including treatment notes from Dr. Kent, Florida Hospital, Halifax Health Hospital, CMH, Ms. Funes, and Dr. Nieves, as well as the opinions of the State Agency consultants.  (*Id.*)  The ALJ also found that the RFC was supported by his "observation and testimony [he] received at the hearing held on December 12, 2018."  (*Id.*)

After considering the RFC assessment and the testimony of the VE, the ALJ determined at step four that Plaintiff could not perform any past relevant work.  (Tr. 32.)  At step five, the ALJ found that, based on Plaintiff's age, education, work experience, RFC, and the VE's testimony, Plaintiff could perform a limited range of medium work (such as a cleaner, production laborer, and packager), and that this work existed in significant numbers in the national economy.  (Tr. 32-33.)  Thus, the ALJ found that Plaintiff was not disabled at any time from December 19, 2014, the date of his SSI application, through March 4, 2019, the date of the decision.  (Tr. 33.) (Tr. 33.)

## III.   Analysis

As noted above, Plaintiff takes issue with the ALJ's assessment of the treatment records from CMH and Dr. Grissom, the ALJ's assessment of the opinion of Dr. Acosta Alicea, and the ALJ's reliance on the testimony of the VE.  The Court agrees with Plaintiff that the ALJ's failure to adequately evaluate the evidence from CMH and the opinion of Dr. Acosta Alicea constitutes reversible error as discussed below.

### A. The ALJ's evaluation of CMH treatment records and Dr. Grissom's opinions

Plaintiff argues that the ALJ "fail[ed] to indicate the weight assigned to Coastal Mental Health and the treating psychiatrist, Dr. Grissom."  (Doc. 27

at 12.)  According to Plaintiff, the medical evidence from CMH and Dr. Grissom showed that he "had significant mental limitations," in particular, "inadequate attention[,] poor judgment[,] paranoid thought processes[,] inadequate perception[,] anxious affect[,] low self-awareness[,] restlessness[,] and agitation."  (*Id.* (citing Tr. 431-32, 435, 441).)  Plaintiff also points out that he was assigned a GAF score of 45.  (*Id.* (citing Tr. 432, 442).)  Because the ALJ failed to note the weight assigned to this evidence, Plaintiff argues, "it is impossible to determine if this evidence was properly considered by the ALJ and how it was factored, if at all, into the [RFC]."  (*Id.*)

In response, Defendant counters that "the mental status examination findings from the CMH notes that Plaintiff cites are not opinion evidence that the ALJ had to assign weight to or articulate good cause to reject," Plaintiff failed to identify the specific opinions the ALJ failed to weigh, the "findings Plaintiff cites are contradicted by other examinations in the record showing Plaintiff's mental functioning was adequate and he was improving with treatment," and the ALJ did not err in failing to consider the GAF scores assigned by mental health counselors at CMH because they were not acceptable medical sources.  (Doc. 31 at 5-7.)

"The [ALJ] must specify what weight is given to a treating physician's opinion and any reason for giving it no weight . . . ."  *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  While an ALJ's RFC determination

does not need to include or account for every limitation found in a medical opinion, "[t]he ALJ is required to provide a reasoned explanation as to why he chose not to include a particular limitation in his RFC determination." *Knoblock v. Colvin*, No. 8:14-cv-646-MCR, 2015 WL 4751386, at *3 (M.D. Fla. Aug. 11, 2015) (internal citations and quotation marks omitted).  As such, "reversal is required where an ALJ fails to sufficiently articulate the reasons supporting his decision to reject portions of a medical opinion while accepting others." *Knoblock*, 2015 WL 4751386, at *3 (citing *Kahle v. Comm'r of Soc. Sec.*, 845 F. Supp. 2d 1262, 1272 (M.D. Fla. 2012)).

"Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 416.927(a)(1).  "[M]ental health counselors are not listed as acceptable medical sources for the purpose of establishing an impairment . . . and their opinions are not entitled to deference."  *Jones v. Colvin*, No. 3:13-cv-114-J-JRK, 2014 WL 1207357, at *5 (M.D. Fla. Mar. 24, 2014) (citing, *inter alia*, 20 C.F.R. § 416.913(a)).  "Nurse practitioners and mental health counselors are not entitled to the deference given treating physicians."  *Hollinger v. Colvin*, No. CA 13-00565-C, 2015 WL 1470697, at *6 (S.D. Ala. Mar. 31, 2015); *Butler v. Astrue*, No. CA 11-00295-C,

2012 WL 1094448, at *2-3 (S.D. Ala. Mar. 30, 2012) ("[A] nurse practitioner's opinion is considered 'other source' evidence, and is not given the same controlling weight as a 'treating source.'").

"Even though a nurse practitioner is not an acceptable medical source, an ALJ must still take into account all of the evidence, including the evidence authored by non-acceptable sources." *Torres v. Colvin*, No. 3:13-cv-1385-J-JRK, 2015 WL 1064639, at *6 (M.D. Fla. Mar. 11, 2015) (citing, *inter alia*, *Corbitt v. Astrue*, No. 3:07-cv-518-J-HTS, 2008 WL 1776574, at *1 (M.D. Fla. Apr. 17, 2008.); SSR 06-3p, 2006 WL 2329939, at *3 (noting that opinions from sources "who are not technically deemed acceptable medical sources . . . are important and should be evaluated on key issues")).  "While the opinions of 'other sources,' such as nurse practitioners and mental health counselors, are not entitled to deference, generally the ALJ 'should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case.'" *Hollinger*, at *6 (citing *Butler*, 2012 WL 1094448, at *3) (internal citations omitted).

First, Plaintiff does not specifically identify the opinions attributable to Dr. Grissom that the ALJ purportedly failed to weigh, but rather conflates the evidence, referring to it as "medical evidence from Coastal Mental Health

and Dr. Grissom."[12]  (Doc. 27 at 12.)   To the extent Plaintiff impliedly argues that the treatment notes co-singed by Dr. Grissom as the supervising clinician are attributable to Dr. Grissom, Plaintiff fails to provide legal support for this contention.  Even assuming the ALJ properly credited the January 14, 2019 treatment note, and the opinions contained therein, to Dr. Grissom, the treatment note is incomplete as two of the pages are missing, thereby frustrating the Court's review.

Next, it appears that Plaintiff implicitly argues that the ALJ failed to properly consider the opinions of non-acceptable medical sources at CMH, including the opinions/treatment notes of LMHC Mescavage, PA Rogers, and LMHC Riley.[13]  To the extent Plaintiff argues that the ALJ failed to weigh the medical records from non-acceptable medical sources at CMH, the ALJ was not required to give these opinions any special deference and they were not entitled to any specific weight.  However, the ALJ nevertheless should

---

[12] Instead, Plaintiff specifically points to the mental status examination findings evidencing "significant" mental limitations in the December 15, 2017 Assessment signed by LMHC Mescavage (Tr. 431-32), the December 28, 2017 Psychiatric Evaluation signed by Teresa Rogers, PA-C, as the rendering clinician, and Dr. Grissom, as the supervising clinician (Tr. 435), and the Re-Assessment report prepared and signed by LMHC William Riley (Tr. 441).  He also points to the GAF scores of 45 assigned by LMHC Mescavage (Tr. 432) and LMHC Riley (Tr. 442) as also indicative of his significant mental limitations.

[13] Of note, the December 15, 2017 Assessment and the August 18, 2018 Re-Assessment were not co-signed by Dr. Grissom, and are exclusively from non-acceptable medical sources, LMHC Mescavage and LMHC Riley.

have explained the weight given to the CMH non-acceptable medical sources,

"or otherwise ensure[d] that the discussion of the evidence in the

determination or decision allow[ed] [Plaintiff] or subsequent reviewer to

follow the [ALJ's] reasoning, when such opinions may have an effect on the

outcome of the case."  20 C.F.R. § 416.927(f) ("Evaluating opinion evidence for

claims filed before March 27, 2017.").

Here, in discussing the treatment records from CMH, the ALJ

indicated he was assigning little weight to the diagnoses by the licensed

mental health counselors (as they were non-acceptable medical sources), and

discounted the CMH records showing Plaintiff had significant mental

limitations by pointing to normal findings, an improving prognosis, and CMH

notes indicating Plaintiff was capable of developing skills to manage his

symptoms and make behavioral change.  (Tr. 30.)  The ALJ also explained

that the complaints made to CMH providers were made primarily by

Plaintiff's wife, which the ALJ found were inconsistent with the medical

evidence of record.  (*Id.*)  However, the Court finds these reasons were not

supported by substantial evidence.  The treatment records from CMH,

including those co-signed by Dr. Grissom, show that Plaintiff's mental status

exams revealed significant mental limitations and symptoms, and that he

was consistently assigned a GAF score of 45 based on serious symptoms or

serious impairment in social, occupational or school functioning.  (*See, e.g.*,

431-32, 435, 441-42, 445-46.)

Even if the ALJ correctly noted that the information or medical history provided by Plaintiff's wife was incorrect, the treatment notes reflect impressions made from contemporaneous observations and mental status examinations of Plaintiff, which revealed significant mental impairments that the ALJ simply disregarded or discounted due to reasons not supported by substantial evidence.  To the extent the ALJ relied on the January 14, 2019 "Clinic Visit Note" to discount the preceding treatment notes from CMH, which evidenced significant mental limitations, the Court finds such reliance to be unsupported by substantial evidence as that record is incomplete (two out of three pages are missing) and it is unclear who authored the note.  Importantly, while the ALJ appears to reject various treatment records based on the fact that they relied too heavily on statements made by Plaintiff's wife, the ALJ appears to implicitly give greater weight to the opinions and findings in the January 14, 2019 treatment note which are, incidentally, based in part on Plaintiff's wife's statements that his psychiatric symptoms were improving with medication.

### B. The ALJ's evaluation of Dr. Acosta Alicea's Opinions

With respect to the opinion of Dr. Acosta Alicea, Plaintiff argues that the ALJ only indicated that he was according little weight to this opinion because "it was inconsistent with the record, including the treatment notes of

the claimant's treating psychiatrist the day before and those of Dr. Nieves in 2018," but failed to explain or indicate how this opinion was inconsistent with the record.  (*Id.* at 12-13.)  "Without further explanation regarding any specific inconsistencies noted between Dr. Acosta [] Alicea's opinion and the medical evidence, it is also impossible to determine whether the ALJ's determination to assign little weight to this opinion is supported by substantial evidence."  (*Id.* at 13.)  As such, Plaintiff contends the ALJ's RFC determination is not supported by substantial evidence.  (*Id.*)  The Court agrees.

The Court finds that the ALJ's reasons for discounting the opinion of Dr. Acosta Alicea are not supported by substantial evidence, particularly since the ALJ based his reasoning, in part, on the incomplete CMH "Clinic Visit Note" from January 14, 2019, which the ALJ did not weigh but attributed to Dr. Grissom even though it is unclear who authored it.  (Tr. 31 ("I give this opinion little weight because it was inconsistent with the record, including the treatment notes of the claimant's treating psychiatrist the day before and those of Dr. Nieves in 2018.").)  To the extent the ALJ relied on this Clinic Visit Note, and attributed it, but not other CMH treatment records, to Dr. Grissom, to discredit the opinion of Dr. Acosta Alicea, the ALJ's reasoning is inconsistent with and unsupported by substantial evidence.  The ALJ's reliance on an incomplete treatment note showing

normal findings to discredit Dr. Acosta Alicea's opinion is not supported by substantial evidence, particularly where the evidence of record tends to support Plaintiff's significant mental limitations. *See Schink v. Comm'r of Soc. Sec. Admin.*, 935 F.3d 1245, 1267-68 (11th Cir. 2019) (noting that it was expected that the claimant, who suffered from bipolar disorder, would experience good days and bad days and that, based on the episodic nature of the his mental impairment, "the ALJ's citation of the good days as evidence of no disability did not support a finding that [he] did not suffer from a severe impairment" or that "his doctor's treatment opinions [were] inconsistent with the record"). The ALJ also failed to explain how the treatment records from Dr. Nieves contradicted the opinions of Dr. Acosta Alicea. Rather, the treatment notes from Dr. Nieves tend to show that Plaintiff suffered from significant mental limitations. (*See* Tr. 418 (assessing Plaintiff on May 4, 2018, in part, with conduct disorder, aggressive behavior, anxiety and depression, "[b]ipolar disorder, current episode depressed, severe, with psychotic features," and schizophrenia, unspecified type); Tr. 421-22 (noting similar assessments on February 15, 2018)).

In sum, the ALJ's reasons for discounting Dr. Acosta Alicea's opinions are not supported by substantial evidence. "The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists,

who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p. However, as shown above, the ALJ's reasons for discounting Dr. Acosta Alicea's opinion are not supported by substantial evidence.

## IV.  Conclusion

Based on the foregoing, the Court finds that the ALJ failed to properly assess the medical evidence from CMH and the opinion of Dr. Acosta Alicea, and it is unclear what impact this evidence would have on Plaintiff's RFC. As such, the ALJ's decision is not supported by substantial evidence and the case will be reversed and remanded with instructions to the ALJ to reconsider the treatment records from CMH, including from licensed mental health counselors, registered nurses, and Dr. Grissom, as well as the opinion of Dr. Acosta Alicea, and to explain what weight they are being accorded, and the reasons therefor.

Moreover, to the extent treatment records from CHM and Dr. Grissom

appear to be incomplete (Tr. 456) or altogether missing (Tr. 448-51),[14] the Court also finds this warrants remanding the case. *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1343 (N.D. Ga. 2006) ("[H]earings before the Commissioner [] are non-adversarial in nature, and oblige the adjudicator (A[ppeals] C[ouncil] and ALJ) to ensure that the hearing record is complete."); *cf. Hoehn v. Colvin*, No. 14-CV-6401L, 2016 WL 241365, at *3 (W.D.N.Y. Jan. 21, 2016) (finding that the ALJ failed to fully develop the record where although the record included approximately 300 pages of medical treatment notes from 2008 through 2012, the ALJ did not request any RFC assessments from the plaintiff's treating physicians or direct the plaintiff obtain one).  Because these issues are dispositive, there is no need to address Plaintiff's remaining arguments. *See Knoblock*, 2015 WL 4751386, at *3 (citing, *inter alia*, *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983)).

Accordingly, it is **ORDERED**:

1.   The Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order, pursuant to sentence four of 42 U.S.C. § 405(g) with instructions to the ALJ to conduct the five-step sequential evaluation process in light of all the evidence, including the opinion evidence from treating, examining, and non-examining sources, and

---

[14] As noted above, there are references to a number of clinic visits at CMH, but no corresponding treatment notes are in the record.  (Tr. 448-51.)

conduct any further proceedings deemed appropriate and to develop a complete record.

2.      The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.      In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** in Jacksonville, Florida, on March 1, 2021.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record